# Exhibit 1

```
                    UNITED STATES DISTRICT COURT
              WESTERN DISTRICT OF WASHINGTON AT SEATTLE
      _____

                                    )
MORGAN ROBERTS, individually and    ) CASE NO. CV25-2209-KKE
on behalf of all others             )
similarly situated,                 ) Seattle, Washington
                                    )
                        Plaintiff,  ) February 11, 2026
v.                                  ) 10:07 a.m.
                                    )
NUNA BABY ESSENTIALS, INC.,         ) Motion Hearing
                                    )
                        Defendant.  )
      _____

                  VERBATIM REPORT OF PROCEEDINGS
           BEFORE THE HONORABLE KYMBERLY K. EVANSON
                  UNITED STATES DISTRICT JUDGE
      _____
```

**APPEARANCES:**

| | |
|---|---|
| For the Plaintiff: | DUSTIN L. SCHUBERT<br>Schubert Jonckheer & Kolbe LLP<br>2001 Union Street, Suite 200<br>San Francisco, CA 94123 |
| | AMANDA M. STEINER<br>Terrell Marshall Law Group PLLC<br>936 North 34th Street, Suite 300<br>Seattle, WA 98103-8869 |
| For the Defendant: | VALERIE GOO<br>Crowell & Moring<br>515 South Flower Street<br>41st Floor<br>Los Angeles, CA 90071 |
| | EMILY J. HARRIS<br>Corr Cronin LLP<br>1015 Second Avenue, 10th Floor<br>Seattle, WA 98104 |
| Reported by: | MARCI E.C. CHATELAIN, CCR, RPR, RMR,<br>CRR, Federal Court Reporter<br>700 Stewart Street, Suite 17205<br>Seattle, WA 98101<br>marci_chatelain@wawd.uscourts.gov |

```
 1                        PROCEEDINGS
 2   ─────────────────────────────────────────────

 3           THE CLERK:  All rise.

 4       This United States District Court for the Western District

 5   of Washington is now in session, the Honorable Judge Kymberly K.

 6   Evanson presiding.

 7           THE COURT:  Good morning.

 8       Please be seated.

 9           THE CLERK:  Now calling case C25-2209, assigned to

10   this Court, Roberts v. Nuna Baby Essentials, Inc.

11       May I have appearances, please, starting with plaintiff's

12   counsel.

13           MR. SCHUBERT:  Good morning, Your Honor.

14       Dustin Schubert, counsel for Plaintiff Morgan Roberts and

15   the proposed class.

16           MS. STEINER:  Good morning, Your Honor.

17       Amanda Steiner, also for plaintiff.

18           THE COURT:  Good morning.

19           MS. HARRIS:  Good morning, Your Honor.

20       Emily Harris on behalf of the defendant.

21           MS. GOO:  Good morning, Your Honor.

22       Valerie Goo on behalf of Defendant Nuna.

23       And also present is Michelle Michelson, in-house counsel at

24   Nuna.

25           MS. MICHELSON:  Good morning, Your Honor.
```

 1            THE COURT:  All right.  Good morning, everyone.

 2       I hope people didn't have too much trouble getting downtown

 3  today on this very exciting Seahawks parade day, but it's nice

 4  to see everyone.

 5       As everyone knows, we are here on defendant's motion to

 6  dismiss.

 7       I do have questions for both parties, but we'll let you go

 8  ahead and make your argument before I start interrupting you too

 9  much.

10       So let's go ahead and start with the defendants.  It is

11  your motion.

12            MS. GOO:  Good morning, Your Honor.

13            THE COURT:  Good morning.

14            MS. GOO:  Let me start with just a little background

15  and specifics about this case.

16       So the plaintiff has brought a case as a class action

17  related to baby car seats.  And the alleged defect in the baby

18  car seat is the fact that the -- it's called the escutcheon.

19  It's a plastic cover that goes over the adjuster button for the

20  car seat.  Their claim is that it's defective in the way it was

21  designed because there is no cover, like a fabric cover or

22  something, covering that button.  Instead, it's a plastic

23  button.

24       And if you wanted to, Your Honor, the picture that shows

25  this is in paragraph 7 of their complaint.  That alleged defect

1  has been remedied through a recall.  The recall was started at

2  the beginning of this year.  The recall remedy kits are

3  available.  And the plaintiff actually got a recall remedy kit.

4  And that remedy kit covers the plastic -- it's called an

5  escutcheon, but I like to call it an adjuster button.  That

6  covers it with fabric, so it's no longer -- the defect is gone,

7  Your Honor.

8      There is no problem with the car seat that is a recall

9  remedy approved by NHTSA.  And I think the plaintiff just is

10  unsatisfied with it, even though NHTSA has sanctioned and

11  approved that remedy.

12      The plaintiff also continues to use her car seat.  She

13  doesn't allege any physical injury.  And she was offered a

14  replacement car seat by Nuna and refused it.  So what we're

15  talking about here, really, is a lawsuit brought by a plaintiff

16  who is unhappy, but not injured.

17      Your Honor, that brings us to the doctrine of prudential

18  mootness, which would cover this entire case.  And the

19  prudential mootness doctrine basically says that the courts have

20  the discretion to dismiss a case when the injunctive relief has

21  already been handled by a coordinate branch of government, in

22  this case NHTSA.  And that is, in fact, what is going on.

23      The recall is overseen by NHTSA.  There's regular reporting

24  to NHTSA.  There's no injunctive relief to be had and --

25  where there are no injuries that are not covered by the remedy.

1      So in this case --

2              THE COURT:  Counsel, let me stop you there.

3              MS. GOO:  Yes.

4              THE COURT:  So the complaint notes that there are

5    multiple of these lawsuits in various states.

6              MS. GOO:  Correct.

7              THE COURT:  Are you aware of any court that has

8    accepted the prudential mootness argument?

9              MS. GOO:  Your Honor, only one court has ruled so far

10   on the motion to dismiss, it's the California case, and we

11   submitted that to Your Honor.

12      In that case, the court denied it.  It did dismiss all

13   claims with leave, but it did not grant based on the prudential

14   mootness doctrine.

15      The other motions are pending.

16              THE COURT:  All right.  Thank you.

17              MS. GOO:  So, Your Honor, in this case, there is no

18   injury that still exists because the remedy has removed any

19   issue with the alleged defect.  And any out-of-pocket costs are

20   also covered by the remedy.

21      So that's the prudential mootness doctrine.  Happy to

22   answer any questions.  I know there were a lot of cases cited,

23   but that's basically what it boils down to.

24      There are also warranty claims alleged in this case, a sort

25   of generalized failure-to-disclose claim, which we have

```
 1   interpreted as a negligent misrepresentation claim, Your Honor.
 2        I'm happy to address it based on an affirmative fraud or
 3   omission claim as well, but --
 4             THE COURT:  Well, I do have a question about that
 5   claim in particular.
 6        So I believe you argued in your reply brief in response to
 7   the opposition's characterization of that claim that the claim
 8   did not sound in fraud, that it was a tort claim, that it was a
 9   negligence claim.  And I understand your reply to say that no
10   Washington court has found a duty in that context --
11             MS. GOO:  Yes, Your Honor.
12             THE COURT:  -- in the context of a negligent omission
13   claim.
14        But in your supplemental brief that discusses Judge
15   Martinez-Olguin's ruling in the Northern District, it seemed
16   like your argument was that the claim should be dismissed
17   because the plaintiff had not adequately alleged actual
18   knowledge of the defects.  Those arguments feel different to me.
19   And so can you help me understand, what's the basis on which
20   you're moving to dismiss those -- that claim?
21             MS. GOO:  Your Honor, we're moving -- because the --
22   that particular count, which is Count 3, is not really defined
23   in a particular way, we are moving on all the grounds; right?
24   So with respect to an affirmative misrepresentation claim or an
25   omission claim, the grounds are the same, essentially, as the
```

 1    CPA claims with the added piece that you need to have causation.
 2    There needs to be causation for the alleged injury.  And here,
 3    the plaintiff fails to allege that she ever saw any of the
 4    alleged misrepresentations.  And so we're moving on that ground
 5    with respect to the affirmative misrepresentation aspect of
 6    Count 3.

 7         With respect to the omission aspect, we're saying that
 8    there is no knowledge.  Those arguments are the same and already
 9    discussed elsewhere in our brief.  The one thing that's
10    different about Count 3 is there's a mention of negligent
11    misrepresentation that does not appear anywhere else in any of
12    the other counts, so we sort of focused on that.

13         The reason for dismissal of the negligent misrepresentation
14    claim in California is different than it is here.  So that's why
15    in the supplemental briefing you didn't see a lot of crossover
16    with the negligent misrepresentation.

17              THE COURT:  Is that because that duty is recognized
18    under California law, but just not Washington law?

19              MS. GOO:  In California, it's different, it's just a
20    different standard.  So either you have to have a physical
21    injury, which does not exist here or in California or anywhere
22    else, actually, or you have to have had targeted statements that
23    were individualized to the plaintiff.

24         And in California, it was just advertising, either print
25    advertising, in-store advertising, social media advertising, and

 1    the court found that was not sufficient.

 2         Here, for negligent misrepresentation, there needs to be

 3    that duty, that very narrow set of circumstances that the

 4    Washington Supreme Court says must exist, and that is it has to

 5    be in the context of a business transaction, you know,

 6    one-on-one, where the person making the representation is in the

 7    business of disclosing information, so that's oftentimes, you

 8    know, a financial adviser, that type of thing.

 9              THE COURT:  All right.  So it's fair to say, then,

10    that the basis for your motion in this case is the lack of that

11    duty?

12              MS. GOO:  In part, Your Honor, yes, for -- as to

13    negligent misrepresentation, yes.

14              THE COURT:  Okay.  All right.  Thank you.

15              MS. GOO:  So on the warranty claims -- and I'm happy

16    to go through this as fast or slowly as you'd like.  The

17    warranty claim -- the express warranty claim, which is Count 1,

18    I think is pretty straightforward.  There is a limited warranty.

19    It is limited to defects and material and workmanship.  That is

20    not what's alleged here.  What's alleged here is a design defect

21    not covered by the express limited warranty.

22         The plaintiffs have tried to argue that, well, there could

23    be other express warranties created by the advertising.  There's

24    two problems with that.  One is that the advertising is so

25    generalized that it cannot form an express warranty.  And it's

1   much of the same analysis as puffery, which we'll talk about in

2   a minute.

3          And the second problem is, there's no reliance; right?

4   Again, there's no allegation that this plaintiff actually saw

5   any of the alleged misrepresentations.  And without that, it

6   could not form the basis or part of the benefit of the bargain,

7   thereby creating express warranty.

8          Your Honor, in fact, I just wanted to add to that.  The

9   plaintiff does allege the basis for her purchase, and it has

10  nothing to do with the representations.  So in paragraphs 74 and

11  75 of the complaint, she alleges that she chose the car seat

12  because it had one of the best crash ratings -- she doesn't

13  mention advertising, she talks about crash ratings -- and that

14  she liked the color.

15         On the implied warranty claim, which is Count 2, Your

16  Honor, the implied warranty claim suffers from two problems.

17  One is there is no privity.  There are no cases cited by the

18  plaintiff.  And we cite cases to the contrary that would

19  establish that there's any privity that exists between a

20  manufacturer and the consumer when that sale was made through a

21  retailer, which is what happened here, Your Honor.

22         And the second piece is that the product itself is still

23  merchantable because she, in fact, still uses it.  And there's

24  no facts alleged that establish that -- that would establish

25  that it's not merchantable.

1          That brings us to Counts 4 and 5, Your Honor, which are the

2     Consumer Protection Act.  There, we're really dealing with --

3     it's a false advertising case; right?  It's a deceptive -- you

4     either made representations which were not true or you omitted

5     -- you disclosed -- to disclose a fact that was material.

6          There has been some discussion in the papers, Your Honor,

7     of the unfair prong in a more generalized way having to do with

8     unscrupulous, immoral behavior.  There are no facts in this case

9     that are alleged to that.  And when you look at the actual

10    count, Count 4, for unfair -- for the unfair prong of the CPA,

11    the facts alleged there all have to do with advertising and the

12    consumer being unaware of the actual facts.  So I think we can

13    set that aside.

14         So we're talking now about the affirmative

15    misrepresentations and the alleged omission that underlie the

16    CPA claim, which is alleged as Count 5, and Count 4, I guess,

17    you know, it's sort of the same.

18         And there, Your Honor, with respect to the affirmative

19    misrepresentations, the claims that -- the representations that

20    are alleged in the complaint are largely puffery.  They are

21    representation statements that are not capable of being proven

22    or disproven.  They can't be tested.  They are generalized

23    statements.  They are subjective statements.  And, Your Honor,

24    those are the -- actually the same statements that were alleged

25    in the California case that the court dismissed.

1    There are a couple that I think, in fairness, arguably
2    could be tested, things like, you know, we test our products in
3    advance, but there's no allegation that those are not true.  And
4    they're also not relevant to this alleged defect.

5    And then that brings us, Your Honor, to the final issue,
6    which is omission.  And there, there's no allegations that would
7    establish that Nuna had knowledge of this defect, let alone
8    superior or exclusive knowledge.

9    The plaintiff talks about testing.  Testing has been
10   rejected as a basis for knowledge, especially when that testing
11   is just sort of generalized testing; right?  The allegation is,
12   well, you test your products before they go to market.  But
13   there's no allegation that any testing would have revealed --
14   any specific testing would have revealed this specific alleged
15   defect.  And that has been rejected by the courts.

16   The other thing that they rely on are customer complaints
17   either to NHTSA or to Nuna.  And they talk about, I think, 26
18   customer complaints to NHTSA, which are on the NHTSA website,
19   and then customer complaints to Nuna.  They don't really
20   distinguish between which ones existed before this plaintiff
21   purchased her product, which was in, I believe, December of
22   2023.  And so we'd really have to exclude everything that
23   happened after.  We can only focus on that presale period.

24   And those complaints alone, again, don't show knowledge.
25   The cases that talk about customer complaints as plausibly

1   giving rise to knowledge all had something more.  So the *Long v.*
2   *Graco* case, in that case the defendant admitted that they were
3   keenly aware of the alleged defect.

4        And in the *Williams v. Yamaha* case, which is a Ninth
5   Circuit case, Your Honor, in that case the allegations were that
6   the defendant received these complaints, itself determined it
7   was an unusually high number, and as a result created an entire
8   customer service group dedicated to address that issue, the
9   alleged defect.

10        There is none of that in this case, Your Honor.  There's
11   just no facts that would establish -- that have been alleged
12   that would establish that Nuna had the knowledge needed to
13   create a duty to disclose.

14        THE COURT:  Let me circle back to the unfairness prong
15   for a moment.  What about the allegation that the recall itself
16   is allegedly ineffective and that is unfair?

17        MS. GOO:  Well, Your Honor, it's not immoral or
18   unscrupulous or any of the other sort of punitive damage-type
19   words that are used in the statute.  It's none of that.  And,
20   Your Honor, the recall itself is being administered and overseen
21   by NHTSA.  So it's not that this recall is something that Nuna
22   is doing on its own, it has strong and regular government
23   oversight.  And there's no allegation here that shows there
24   would, in fact, be any issue with the recall in the way it's
25   being administered.  The plaintiff got the notice.  The

1    complaint alleges the notice.  In fact, it alleges two notices.

2    The remedy kits are available, the plaintiff received a remedy

3    kit.  The remedy kit covers the plastic button, right, which is

4    what the plaintiff says is the defect.  The plaintiff says it

5    was not covered and it should have been covered, that's the

6    defect.  The remedy kit, in fact, covers that.  And if you want

7    to find the evidence of that, Your Honor, we have submitted it

8    in Exhibit D to Ms. Harris's declaration.  It's also available

9    on the NHTSA website, which I can give you a copy of, which

10   is -- specifically, that page on the NHTSA website is referenced

11   in -- in the complaint.  So if you'd like that, I'm happy to

12   give that to you.

13        And it has gone to every -- it's available, and the notices

14   have been sent to the purchasers nationwide of this product.  So

15   there's really no issue with the recall.

16        THE COURT:  But is that something that the Court can

17   consider on a motion to dismiss if it is alleged to be

18   inadequate?

19        MS. GOO:  Well, Your Honor, they would have to allege

20   actual facts that it's inadequate.  And it can't contradict

21   facts, which the Court can take judicial notice of, including

22   the notice letters, including the fact that it's being oversaw

23   by NHTSA -- overseen by NHTSA, and including the fact that the

24   remedy provided is exactly -- addresses exactly the defect that

25   is alleged, which this Court can take judicial notice of.  And

1   including the fact that reimbursements are provided for anyone

2   who went out of pocket.

3           THE COURT:  All right.  Thank you.

4           MR. SCHUBERT:  Good morning, Your Honor.  Dustin

5   Schubert on behalf of plaintiff Morgan Roberts and the proposed

6   class.

7           Your Honor, this case concerns a premium child safety

8   product that's supposed to do one thing above all else, keep a

9   child securely restrained in a car.  Ms. Roberts' complaint

10  alleges that ordinary foreseeable debris, crumbs, bits of food,

11  small toys, the everyday reality of transporting young children,

12  can interfere with the harness mechanism and allow the straps to

13  loosen without pressing on the release button.  This presents a

14  serious safety issue.

15          Nuna later acknowledged the defect and the serious risk it

16  posed in November of 2024 and initiated a recall of more than

17  600,000 RAVA car seats.  But instead of replacing the car seats

18  or refunding families, Nuna sent parents a kit three months

19  later and told them, install parts yourself and perform a

20  harness function test before every use.

21          THE COURT:  But did they also offer to replace the car

22  seats at Nuna's expense?

23          MR. SCHUBERT:  Not an express offer to replace the car

24  seats.  Our particular client was offered that after going back

25  and forth with customer service over -- I think she's alleged

1   like an hour or two, which was a painstaking process.  The
2   initial recall notices, to my knowledge, didn't provide for a
3   full replacement that's something that she could obtain.
4   Ms. Roberts, in the complaint, found that remedy unsatisfactory
5   and impractical.  It would have required her to operate for an
6   indefinite period of time without a suitable replacement where
7   she would have had to buy a different one, which she didn't have
8   the resources to do so.

9        So during this period after the recall is announced, but
10  before individuals receive remedy kits, families continued to
11  use these unsafe products while they waited.  And even after the
12  remedy kit arrived, the burden of making the repair and ongoing
13  safety verification, it fell on parents and not on Nuna.  And we
14  have allegations in our complaints that the repair does not
15  reliably solve the problem and that at least some RAVA users
16  continued to experience strap loosening even after applying the
17  fix.  So from the consumer's perspective, the safety risks
18  simply didn't disappear once the kit arrived.

19       As it's alleged, Ms. Roberts purchased her RAVA car seat in
20  December of 2023.  And by then, according to our complaint, this
21  problem about strap loosening had already been surfacing for a
22  number of years.  We identify more than 20 National Highway
23  Traffic Safety Administration complaints predating her purchase,
24  several which explicitly describe that they had contacted Nuna
25  directly about the harness loosening problem.

1  So this isn't hindsight driven by the recall, this isn't a

2  theoretical defect, it's a real one.  Ms. Roberts experienced it

3  on multiple occasions.  Scores of other RAVA users reported the

4  exact same thing.  Rather, the crux of this case is that warning

5  information existed and plausibly existed within Nuna's

6  knowledge and possession, both before the sales and after the

7  sales in question.  Yet the product continued to be marketed as

8  extensively tested, as exceeding American safety standards, and

9  as providing reliable security.

10  And the minimal relief that Nuna eventually offered to RAVA

11  purchasers has come too little and too late.  It's about four

12  years after complaints initially had surfaced on the NHTSA

13  website about strap loosening.

14  We submit, Your Honor, that a reasonable parent deciding

15  whether to spend $500 or more on a car seat would want to know

16  these critical facts.  Had Ms. Roberts known them, she would not

17  have paid a premium price for the RAVA, or she would have

18  purchased a different car seat altogether.  That's why in this

19  case we seek damages, we seek a refund, we seek a suitable

20  replacement for her RAVA.  And at the pleading stage, of course,

21  these allegations are accepted as true.  I think within that

22  framework I think the obvious place for us to start is with the

23  Washington CPA claim.  And we submit that it provides the most

24  straightforward path for the case to proceed because it doesn't

25  require proof of intent or even actual deception, only conduct

1    that has the capacity to deceive or that is unfair.  And I'll

2    start there, and then I can move on to address the warranty

3    claims and the omission claim.

4        So with respect to the CPA, there are five elements, that's

5    *Hangman Ridge*.  Nuna only challenges the first, which is whether

6    the conduct is unfair or deceptive.  The statute's written in

7    the disjunctive, so as the Washington Supreme Court has made

8    clear in *Klem v. Washington Mutual*, conduct can be unfair

9    without being deceptive.  And if either is established, the CPA

10   is satisfied.

11       We plead two paths, Count 4 and Count 5, as separate paths.

12   They are complementary, they're not redundant.

13       With respect to unfairness, I think that's the easiest

14   claim for the Court to resolve in plaintiff's failure and

15   benefit -- favor.  So this theory on unfairness, it doesn't

16   sound in fraud.  Rule 9(b) doesn't apply.  The Washington

17   Supreme Court emphasized in *Greenberg v. Amazon* that unfairness

18   is just a flexible concept.  Courts do look to whether the

19   conduct causes substantial injury, it offends public policy,

20   it's immoral, unethical, unscrupulous.  We submit that our

21   allegations fit within that framework.

22       And on just some basic facts, parents paid premium prices

23   for the RAVAs.  They later learned it had a harness problem that

24   could arise from just routine debris entering the mechanism,

25   something itself that Nuna acknowledges is essentially

1    inevitable.

2          And then when Nuna acted, the remedy came years too late,

3    years after the complaints initially began with NHTSA.  It

4    required parents to perform the installation, and then it

5    required the parents to keep checking the seat before every use.

6    The complaint alleges that even then, the problem may persist.

7    We've submitted I believe it's four or five complaints from the

8    NHTSA database that suggest that parents who followed the remedy

9    did still experience strap loosening.

10          Requiring families to bear the burden of risk and repair

11    for a safety device we submit just plausibly qualifies as unfair

12    under these circumstances.

13          And with respect to the unfairness of the recall itself, I

14    think the *Maadanian v. Mercedes-Benz* case is instructive.  The

15    allegations are there that the manufacturer in connection with a

16    recall shifted responsibility to the consumers during an

17    inadequate process that was cumbersome and burdensome.  For the

18    district court there, that was sufficient to establish a CPA

19    claim.  Same applies here with equal force.

20          So even if there were concerns about, you know, omissions

21    or reliance, we submit that the unfairness claim independently

22    survives.

23          Moving on to deception, which is Count 5, I believe, that

24    count is different, but it's still not common law fraud.  Here,

25    the question is whether simply the conduct by Nuna had the

1    capacity to deceive.  And from *Young v. Toyota* from the Supreme

2    Court in 2020, we don't need to prove intent, we don't need to

3    prove reliance, we don't even need to show that anyone was

4    actually deceived.  I think *State v. Living Essentials* from the

5    Washington Court of Appeals is in accord with those principles.

6         We allege here, in general terms, specifically with respect

7    to our complaint, that Nuna marketed the RAVA as extensively

8    tested, as exceeding safety standards, and as providing reliable

9    security.  At the same time, the complaints about harness

10   loosening were already accumulating, including some made

11   directly to Nuna before Ms. Roberts purchased her RAVA in

12   December of 2023.

13              THE COURT:  For your deception claim --

14              MR. SCHUBERT:  Sure.

15              THE COURT:  -- doesn't the plaintiff need to allege

16   and ultimately prove that Nuna knew or should have known about

17   the defect before Roberts bought her seat?

18              MR. SCHUBERT:  I think knowledge is relevant.  I don't

19   think we agree it's relevant to the same extent that Nuna does,

20   but I do think at the pleading stage, we plausibly allege that

21   Nuna was aware.  We have, before Ms. Roberts' purchase, over 20

22   complaints to NHTSA.  Like four of them that we've pled indicate

23   that they had relayed -- those individuals had relayed the same

24   concern to Nuna.

25              And I think if we're talking about knowledge and numbers,

1    the other relevant number to talk about is this number 509.

2    That's a number from NHTSA from I believe it's October of 2024,

3    so a year after Ms. Roberts' purchase.  That's the number of

4    total incident reports that NHTSA had in its files regarding the

5    RAVA defect.  That's a year after, but plausibly, we submit that

6    a lot of those complaints were submitted to NHTSA or directly to

7    Nuna prior to her purchase.

8          THE COURT:  But I think that the allegation is there

9    were three submitted directly to Nuna prior to her purchase.

10   And is it really reasonable to say that three complaints

11   directly to Nuna should have alerted them to a design defect in

12   600,000 seats?

13         MR. SCHUBERT:  It's a fair question.  I think it is

14   four, instead of three.  But that issue aside, I don't think

15   there's any Washington authority that speaks to -- in the

16   context of a CPA claim what the right number is.  The cases that

17   are cited by Nuna with respect to motions to dismiss in other

18   courts are applying a different statutory framework.  It's a --

19   it's a flexible concept, we submit, in Washington.

20       The other numbers, we're aware that Nuna maintained

21   internal databases relating to consumer complaints.  That's

22   reflected in the NHTSA documents.  I think it's -- I think it's

23   -- *Zendesk* is one of them.

24       We don't have access to those materials, but we submit, and

25   it's in our complaint, that at least within a year after

 1    Ms. Roberts' purchase, there are already 500 incident reports,

 2    that -- that includes a big number we submit from -- that are

 3    submitted directly to Nuna.  We don't know exactly the

 4    breakdown, Nuna hasn't told us.  We haven't gotten to that phase

 5    of discovery.

 6        We're not asking Your Honor on the pleading stage to decide

 7    what Nuna knew, when it knew it, we're asking for plausible

 8    inference that Nuna knew at the time of Ms. Roberts' purchase.

 9    We submit that we've satisfied that.

10        THE COURT:  And when you refer to different standards

11    in other courts, are you referring to this unusually high number

12    of complaint standard that was discussed in the California case?

13        MR. SCHUBERT:  I am, Your Honor.  That's, I think,

14    with respect to the UCL claim.  There's a wide body of law

15    talking about consumer complaints and NHTSA complaints.  I'm not

16    really familiar -- I'm not aware of a case that really speaks to

17    it with specificity as to the Washington claims, the CPA, about

18    what number is the magic number.  But I think we've established

19    it here, at least at the pleading stage.  Discovery will tell

20    what exactly Nuna knew and when it knew it and how many

21    complaints it had received directly at that point in time, at

22    the time that Ms. Roberts purchased.

23        I think moving on to the -- unless Your Honor has more

24    questions with respect to the CPA, I can briefly address the

25    warranty claims.

 1          We plead two different types of express warranty in this

 2    case.  The first is on the basis of the limited warranty, the

 3    written document that accompanied Ms. Roberts' purchase.  The

 4    second is the affirmative representations that were made in

 5    Nuna's marketing materials.

 6          So with respect to, first, the limited warranty, what Nuna

 7    really asked the Court to decide at the pleading stage is that

 8    the defect here is one of design rather than materials and

 9    workmanship.

10          THE COURT:  But isn't that what's alleged?  I mean,

11    your complaint alleges a design defect.  I don't see a materials

12    and workmanship allegation.

13          MR. SCHUBERT:  At least in one passing reference, it's

14    referenced as a design defect.  I think our opposition to the

15    motion to dismiss makes clear that we're not conceding that it's

16    a design defect.  And I think that the Washington cases have

17    spoken to this, and we've cited them, speak to the -- whether

18    something is a design defect or materials and workmanship defect

19    is -- can be and should be in many instances decided following

20    discovery to figure out exactly what the nature of the defect

21    is.

22          Here, we're obviously at the pleading stage.  We're relying

23    on public materials.  We submit that it's appropriate to decide

24    that later in the case and not at the pleading stage.

25          And I think that's different than -- to draw a distinction

1    between our case and the California case.  I think Washington

2    has a body of law that suggests that's the appropriate approach.

3    I'm not familiar whether California has adopted the same thing.

4         THE COURT:  Does it matter that you allege that Nuna

5    had knowledge of the defect by virtue of its redesign?  Because

6    wouldn't a redesign suggest it was a design defect?  I mean, you

7    don't allege, well, they changed the materials after a certain

8    point or got a different manufacturing vendor.

9         MR. SCHUBERT:  What we know that Nuna did, whether you

10   call it a refresh or redesign or what terminology, is they

11   replaced -- my understanding, at least, is they replaced what

12   was a plastic cover to the harness adjuster clamping mechanism

13   with a cloth one.  That's a swap in materials.  Conceivably,

14   that is a materials and workmanship defect.

15        Again, at the pleading stage, we allege or we submit that

16   we have enough to move into discovery on that count.  But I

17   understand the Court's position or the thinking from Your Honor.

18        With respect to the second part of express warranty, that's

19   the safety marketing, this isn't puffery.  We acknowledge and

20   recognize the California court agreed with Nuna with respect to

21   the specific safety representations for purposes of express

22   warranty.  But under Washington law, it's different.  And the

23   question is whether the statements here were subjective or

24   whether they were factual representations capable of being

25   tested.

1          THE COURT:  Did Roberts allege, though, that she saw

2     any of this advertising?  I feel like that's the crux of the

3     motion.

4          MR. SCHUBERT:  What she alleges, and I think counsel

5     for Nuna identified the paragraph, I think 74, is that she took

6     two months to research this.  She cared about safety.  She

7     relied -- she ultimately decided to purchase the Nuna because,

8     in her view, it had the best safety crash ratings compared to

9     other car seats that she was considering.  We submit that's

10    enough in terms of the express warranty and awareness of the

11    representations at the pleading stage.  And I think that the

12    Washington cases bear that out.

13         The one I'd address -- or direct the Court to look at is

14    *Baughn v. Honda Motor*.  And it's different than a reliance

15    element, the way that the Court characterized it there, and it's

16    from the Washington Supreme Court, is that the buyer be aware of

17    the representation.

18         Here, we allege she researched the seats, she compared

19    seats, and that safety was a key element to why she ultimately

20    chose the RAVA.  I think under *Baughn* we have enough.  And

21    that's a critical distinction from cases where -- particularly

22    in California, where you would need to plead express reliance on

23    representations.

24         On -- moving on with respect to the implied warranty claim.

25    So, here, if the allegations are true, a car seat harness can

1    loosen because of routine debris.  That's obviously not fit for

2    ordinary purpose.  The core function of a car seat is defeated

3    if it can spontaneously loosen.  That's merchantability.

4        Washington courts, including in this district in *Short v.*

5    *Hyundai*, have recognized that implied warranty claims against

6    manufacturers can proceed past the pleading stage,

7    notwithstanding these privity arguments that Nuna has asserted.

8    Washington applies the third-party beneficiary rule to privity.

9    It applies the sum-of-the-interaction test, in contrast to other

10   jurisdictions, in contrast to California, which rule on the

11   implied warranty claims.  Both presale and post-sale conduct is

12   a consideration in the sum-of-the-interaction test.

13           THE COURT:  What's your response to counsel's argument

14   that the car seat is inherently merchantable because the

15   plaintiff is still using it?

16           MR. SCHUBERT:  We would say and do say that continued

17   use, which is what Nuna has told individuals to do, to apply the

18   fix, then to continue using it, and to do the harness function

19   test, continued use under direction from the defendant, and

20   continued use because there are no other economic choices for

21   our clients, that we satisfy that this product is not

22   merchantable.

23       And I think adding to that, we have these handful of

24   complaints from the NHTSA database suggesting that the recall

25   either doesn't work -- or that the fix doesn't work or that it's

1    impermanent, in that after applying the fix and swapping out the

2    materials, that the problem can resurface.

3         We believe it's plausible at this stage of the case to

4    allege and maintain that the product remains unmerchantable in

5    its present condition, even with the fix.

6         So with respect to privity, which is a key argument

7    advanced by Nuna on the implied warranty, here we have both.

8    Our client purchased through an authorized partner, Pottery

9    Barn.  That's an element of the sum-of-the-interaction test.

10         And then the post-sale conduct is meaningful here.

11    Following her purchase, you know, she received the recall

12    notice, she engaged with Nuna on a number of occasions through

13    customer service to learn more about the details of the recall

14    to ultimately hope to obtain different remedy than what was

15    offered.  That post-sale conduct in connection with the recall

16    process is sufficient in our minds to satisfy the

17    sum-of-the-interaction privity requirement that is understood

18    for Washington implied warranty claims.

19         With respect to the prudential mootness doctrine, you know,

20    the Court -- the California court, Judge Martinez-Olguin,

21    already ruled on this matter.  Like the plaintiffs there,

22    Ms. Roberts alleges the recall is inadequate, that it's

23    inadequate because it doesn't provide for money damages, it

24    doesn't provide for a suitable replacement.  There are questions

25    that we allege in our case whether the recall is permanent or

1   whether it still contin- -- the fix is permanent or whether --

2   continued problems that may arise from its use.  Under

3   prudential mootness, Judge Martinez-Olguin got it right.  We see

4   no reason for this Court to diverge from that.  Nuna had its

5   opportunity in its supplemental brief to discuss the

6   applicability on the prudential mootness doctrine.  And Judge

7   Martinez-Olguin's ruling thereon, there's no footnote that says

8   that we think -- that they thought that she got it wrong without

9   further elaboration.  I don't think it's -- there's no

10  meaningful distinction between the California case and our case

11  on the prudential mootness grounds.

12      With respect to the failure to disclose material

13  information, I believe that's Count 3, we largely proceed on a

14  negligent omission theory.  I think the central dispute can be

15  whether Nuna had a duty to disclose.  And then Washington law

16  recognizes that if there's a duty to disclose, that failure to

17  do so can support liability for this type of claim.  That's the

18  *Merriman* case.  The duty is context dependent.

19      Courts look at factors such as superior knowledge,

20  pecuniary interest in the transaction, whether defendant made

21  partial or incomplete representations.  That's what we allege

22  here, that Nuna had a financial stake in selling these seats.

23  They marketed them directly to parents as safe and extensively

24  tested.  And according to our complaint, at the relevant times,

25  Nuna possessed information suggesting a serious harness failure

1    risk that consumers didn't have access to.

2         THE COURT:  So you would agree, then, that -- and I

3    understand it's your position that you've satisfied this

4    standard, but you would agree, then, that the standard is both

5    that plaintiffs must allege that Nuna had knowledge and, then,

6    also a duty to disclose what it knew.

7         MR. SCHUBERT:  I do think we concede that point, Your

8    Honor, yes.

9         In terms of comparables, federal courts in this district

10   have found the kinds of allegations that we've pled here

11   sufficient to proceed past Rule 12.  We would direct the Court

12   to *Tucker v. BMW* where the court held that allegations that a

13   manufacturer had superior knowledge of a defect and made

14   incomplete safety representations were enough for the pleading

15   stage.

16        Unless Your Honor has further questions, I'll close with

17   this.  At this stage of the case, at the pleading stage,

18   Ms. Roberts is not required to actually prove what Nuna

19   ultimately knew.  We're not required to prove why the defect

20   occurred or whether the remedy will ultimately succeed.  Rather,

21   we must only plausibly allege that a product sold as safe may

22   not have been, and that the warning information that plausibly

23   existed before she purchased her RAVA in December of 2023 was in

24   Nuna's possession.  And here, we additionally allege that -- we

25   plausibly allege that the recall did not provide the relief that

1    she seeks.  We submit that she's done all of that.  At a

2    minimum, the CPA claim provides a straightforward basis for the

3    case to proceed.  And on the warranty theories, those present

4    factual questions where courts typically, within Washington,

5    reserve those for discovery and for further resolution at a

6    later stage of the case.

7        For those reasons, we submit that the motion to dismiss

8    should be denied in its entirety.

9            THE COURT:  Just one follow-up question, Counsel.  So

10   with respect to what I just heard you articulate as the

11   negligent omission theory, the components of that claim, would

12   you agree, then, that that claim rises or falls with the CPA

13   deception claim, or are you arguing it's a different standard?

14           MR. SCHUBERT:  It's a different standard.  I believe

15   it's a heightened standard.  We believe that the CPA is a lower

16   standard, it's more flexible, doesn't require intent, doesn't

17   require actual deception, just the capacity to deceive.  I think

18   the failure to disclose information is admittedly a higher

19   standard.  We submit we satisfy both.  But that's where we

20   stand.

21           THE COURT:  All right.  Thank you very much.

22           MS. GOO:  May I respond, Your Honor?

23           THE COURT:  You may.

24           MS. GOO:  Thank you.

25       Your Honor, before I respond to the legal arguments, just a

1    couple things for the Court's background knowledge.

2         The harness function test is literally you hold the car

3    seat with one hand, you hold the straps with the other hand, and

4    you pull, and you see if they loosen.  So there's been a lot of

5    talk about this harness function test.  It's really not a

6    difficult test.  And, you know, if this case proceeds, you will

7    see that it's actually something that the consumers are

8    instructed to do every time they use their car seat.

9         And with respect to the plaintiff's refusal of the

10   replacement offer, it was going to take a couple days, not an

11   indeterminate amount of time.

12        Those are really background facts for you.

13        So I want to talk about the omission claims.  Whether you

14   phrase it as, you know, fraudulent omission, negligent omission,

15   or part of the CPA claim, you can't omit something that you

16   don't know.  And that's really what we're talking about here,

17   did -- are there facts alleged that show that Nuna had knowledge

18   of this alleged defect.

19        Here, the plaintiffs have thrown a lot in their complaint

20   about complaints, but the question is, did Nuna have exclusive

21   or superior knowledge.  So with respect to the NHTSA complaints

22   and anything that might have been, you know -- I don't think

23   they allege anything online, but the NHTSA complaints and the

24   other complaints that they've alleged that are public, that

25   doesn't show exclusive or superior knowledge.

```
 1            THE COURT:  Is that a standard that Washington courts

 2    require, because I believe counsel argued that that was a

 3    California standard.

 4            MS. GOO:  No, it's also Washington courts.

 5        And with respect to what did Nuna know, I just wanted to

 6    point out for reference, Your Honor, that in the opposition, the

 7    plaintiff argues that the NHTSA complaints confirm that Nuna was

 8    informed of the defect on several occasions before Ms. Roberts'

 9    purchase in December of 2023, and then they cite three

10    complaints.  So that is on ECF 27 at page 15, lines 2 through 5.

11    So we're talking about three complaints.

12        The bottom line, though, Your Honor, is that it's not a

13    numbers issues, it's not how many complaints were there, or how

14    many -- how many complaints existed, or how many complaints did

15    the defendant know of.  The question is, does that give rise to

16    knowledge.  And the Washington court -- let me just get it open

17    here.  In the Short case, the Washing- -- the Western District

18    of Washington court addressed this.  And I am citing Short v.

19    Hyundai, Your Honor.  In that case, plaintiffs alleged hundreds

20    if not thousands of NHTSA complaints.  And defendants regularly

21    reviewed those NHTSA complaints.  But the courts found that

22    while NHTSA complaints may buttress the inference of defendant's

23    knowledge, they would likely be insufficient standing alone to

24    create a plausible inference of defendant's knowledge of the

25    defects at issue.  And that is on page *7, Your Honor, of that
```

1   case.

2        So, really, we need to look at the complaint, we need to

3   look at what allegations there are that would show Nuna's

4   knowledge, and the allegations simply aren't there.  And without

5   allegations that would show Nuna's knowledge, there can't be an

6   omission claim, whether it be under the CPA context or the

7   negligent omission context.

8        Your Honor, with respect to express warranty, I think it's

9   pretty clear that what's alleged is a design defect.  But just

10   to further drive that point home, Your Honor, a manufacturing

11   defect, the *Harju* court said, is a departure from the product

12   specifications in the manufacturing.

13        Here, that's not what's alleged.  What's alleged is every

14   product has this defect because of the way it was designed

15   without a cover over the adjuster button.

16        With respect to reliance on any affirmative statement that

17   might create an express warranty, we contend there are none.

18   There is no allegation of reliance.  The plaintiff alleged that

19   she relied on crash test results, and those are not on the

20   website, and they're not alleged to be on the website.  And the

21   color.

22        With respect to the implied warranty and the third-party

23   beneficiary exception, yes, there is a sum-of-interaction test

24   in Washington, but the case that the plaintiff cites for that is

25   a case where the interactions are direct between, in that case,

1   the designer of a green storage facility, I believe, and the

2   ultimate consumer.  And so there were interactions, but they

3   were direct interactions with the specific plaintiff.  That's

4   not this case.  And the plaintiff has cited no cases where in

5   this consumer retail type of scenario there is either a

6   third-party beneficiary exception applied or a

7   sum-of-the-interactions exception applied.

8        And finally, Your Honor, on the issue of prudential

9   mootness, yes, Judge Martinez-Olguin declined to dismiss the

10  case on those grounds.  But that is a discretionary dismissal,

11  Your Honor, it's not mandatory.  And so we would just say, You

12  do have the discretion, should you choose to do so, to dismiss

13  on those grounds as well.

14       Thank you.

15            THE COURT:  All right.  Thank you, Counsel.

16       The Court will take about a 10-minute recess and come back

17  and issue a decision.

18            MS. GOO:  Thank you, Your Honor.

19            THE CLERK:  All rise.

20            (Court recessed 10:58 a.m. to 11:26 a.m.)

21            THE CLERK:  All rise.

22       This United States District Court for the Western District

23  of Washington is again in session, the Honorable Judge Kymberly

24  K. Evanson presiding.

25            THE COURT:  Please be seated.

```
 1        All right.  Counsel, thank you for your patience.

 2        I am prepared to rule, although just inadvertently closed

 3   my ruling, so I need to reopen it, so I'll ask for your

 4   indulgence for another moment.

 5        All right.  All right.  Thank you for your arguments this

 6   morning, and your briefing.  It was helpful, and I appreciated

 7   the opportunity to get answers to my questions.

 8        And my intent in giving you an oral ruling this morning is

 9   so that the parties can move on and so that this case can

10   progress in the most efficient and expedient manner with some

11   direction, which I will give you now.

12        So the defendant's motion is granted in part and denied in

13   part as follows:

14        Defendant's motion to dismiss for prudential mootness is

15   denied.

16        The Court finds that plaintiff's action is not mooted by

17   the recall because she requested relief not available under the

18   recall.  And she also alleges the recall itself is inadequate.

19        Defendant's motion to dismiss the claim for breach of

20   express warranty under Rule 12(b)(6) is granted with leave to

21   amend.

22        As to the breach of the limited warranty, this warranty

23   does not address the design defect described in the complaint.

24   Although plaintiff contends that the complaint references

25   multiple defect theories, the Court's review of the complaint as
```

1  currently written reveals only allegations of a design defect.

2      As to the breach of advertising warranties, plaintiff

3  failed to allege facts showing that she relied on or even saw

4  prepurchase statements made in defendant's advertising.

5      Defendant's motion to dismiss the claim for breach of

6  implied warranty of merchantability is granted with leave to

7  amend.  The complaint does not plead sufficient facts to permit

8  the Court to infer that an exception to the privity requirement

9  applies, but additional allegations may cure this deficiency.

10     Defendant's motion to dismiss the complaint for negligent

11 failure to disclose material facts is granted with leave to

12 amend.

13     Plaintiff has not adequately pleaded that Nuna had presale

14 knowledge of the defect such that it could have disclosed it to

15 plaintiff, assuming it had a duty to do so.

16     Defendant's motion to dismiss the claim for a CPA violation

17 based on unfair acts or practices is denied.

18     Plaintiff's allegation that the recall is inadequate and

19 ineffective are adequate to state such a claim.

20     Defendant's motion to dismiss the claim for a CPA violation

21 based on deceptive acts or practices is granted with leave to

22 amend.  Such a claim requires plausible allegations that

23 defendant knew or should have known the RAVA was defective at

24 the time plaintiff purchased her RAVA, and the complaint lacks

25 such allegations.  That three or four consumers complained of a

1  defect directly to Nuna before plaintiff purchased her RAVA and

2  that 20-something or fewer consumers complained to the NHTSA by

3  March 2024 is not sufficient to show that Nuna knew that

4  plaintiff's RAVA was defective when she purchased it in December

5  of 2023.

6      That the RAVA was redesigned or refreshed before plaintiff

7  purchased hers merely speculates that it was redesigned because

8  of the defect.

9      That children are inherently messy does not suggest that

10  defendant should have known that the RAVA was defective if

11  defendant had no reason to know that crumbs would cause the RAVA

12  to malfunction.

13     As the complaint alleges that defendant's practices were

14  fraudulent and that defendant deliberately and knowingly

15  concealed information from the plaintiff, the heightened

16  standard pleading of Rule 9(b) applies.  The complaint does not

17  satisfy the standard for this claim.

18     So with that, again, to repeat, the motion is granted in

19  full, with the exception of the CPA claim based on unfair

20  practices.

21     Now, because leave to amend has been granted, the Court

22  will order plaintiff to file an amended complaint, if it chooses

23  to do so, by no later than March 11th, 2026.

24     So that is the Court's ruling on the motion.  We'll enter a

25  short order just memorializing that the motion was granted in

 1    part and denied in part and setting the date for an amended

 2    pleading.

 3         Is there anything else we need to take care of today?

 4              MS. GOO:  I don't think so, Your Honor.

 5              MR. SCHUBERT:  Could I just be heard for one moment?

 6    Go to the podium?

 7              THE COURT:  Right there is fine.

 8              MR. SCHUBERT:  Oh, okay.

 9         No, I just wanted to -- if the Court could explain its

10    views on discovery and where we stand on that, whether it's open

11    or closed.  This is one of six class actions around the country.

12    My understanding is that discovery is open and being produced in

13    four of them.  California plaintiffs filed an amended complaint

14    with the documents contained in discovery last Friday, I

15    believe.  We feel like we should be entitled to that

16    information, coordinated potentially with the other plaintiffs.

17    And to the extent that we get it, previewing for Your Honor that

18    maybe some additional time to file an amended complaint would be

19    appropriate, to obtain that information, and to put it in an

20    amended complaint.

21              THE COURT:  Ms. Goo, do you have a response to that?

22         I'll just advise, as a general proposition, as I'm sure the

23    parties are aware, a pending motion to dismiss does not stay

24    discovery automatically, although defendants can and do request

25    stays of discovery in those instances.  There's not a case

 1    schedule currently in place in this case because of the pending
 2    motion.  Though now that the motion has been denied in part, at
 3    least, presumably there's not a reason to stay discovery, but,
 4    Ms. Goo, go ahead.
 5            MS. GOO:  Your Honor, our position is that they should
 6    not be allowed to use discovery to fish for additional claims.
 7    And that would be our concern.  So if discovery were to proceed,
 8    we would ask that it be -- that it proceed in a coordinated
 9    fashion, but limited to the live claims in this case, Your
10    Honor.  And then once we get through and have set pleadings,
11    that will set the scope of discovery for this case.
12            THE COURT:  Any response to that?
13            MR. SCHUBERT:  Yeah.  And this is -- it's based on
14    representations made in the California case from the California
15    plaintiffs, but my understanding is there's an existing
16    production of materials that Nuna produced to NHTSA.  We think
17    those materials should be produced now.  We don't see a basis
18    for refusal.
19        We propounded discovery in late December on Nuna.  They, to
20    this point, refuse to engage in it.  We don't see a basis for
21    not just providing those materials, subject to a suitable
22    protective order.  We provided one -- a draft of one to the
23    defendants already.  We see no basis for denying us the access,
24    at least, to the same materials that are being provided to other
25    plaintiffs who are also not past the pleadings.

1          MS. GOO:  Your Honor, the difference is in those other

2    cases, there was a case management conference set.  We held the

3    Rule 26(f) conference.  In this case, that had not happened, so

4    discovery is not technically open.  That was the reason for the

5    objections that they received, because they propounded early

6    discovery, right, premature discovery.

7          And our position doesn't change with respect to they should

8    not be allowed to use discovery to fish for additional claims.

9    They have a plaintiff.  They have the knowledge of what the

10   plaintiff has done.  They've already filed a case.  And so if

11   discovery were to proceed in this case, again, we believe it

12   should be limited to the scope of the case, which right now is

13   limited.

14         THE COURT:  All right.  I don't, obviously, have the

15   discovery in front of me, so this issue is not fully teed up.

16       What I'm hearing from Nuna is it sounds like they're

17   requesting some limitations on discovery that would be

18   consistent with the existing live claim.  I haven't seen the

19   discovery request, so it's hard for me to say in a vacuum

20   whether the existing discovery is consistent with the remaining

21   live claim, which, in fairness, to everyone here, you just found

22   out 30 seconds ago what the remaining live claim is.

23         And so let me tell you what my procedure is for discovery,

24   recognizing we have not had a case schedule entered yet.  But

25   what I do before discovery motions are filed is I require the

1    parties to submit a joint statement of the discovery dispute,

2    three-page joint statement, that outlines each party's position.

3    Obviously, you need to meet and confer to do that.  And then we

4    schedule a discovery conference.  So I think in this case

5    because there's already been some discovery propounded, there is

6    at least one live claim, this mechanism would be appropriate

7    even at this stage of the case.  And so I'm going to have you go

8    ahead and do that.  You can do that on your own schedule.  So

9    you can meet and confer and prepare your three-page joint

10   statement, and then what I'll have you do is you file that, and

11   then you can request a conference with Ms. Staples, and then

12   I'll get everybody on Zoom, and we can talk about it.  I think

13   it would make more sense to have a little bit of your positions

14   fleshed out, and also give you the opportunity to talk to each

15   other now that you know the lay of the land.

16            MS. GOO:  Thank you, Your Honor.

17            MR. SCHUBERT:  Thank you, Your Honor.

18            THE COURT:  All right.  All right.  If there's nothing

19   else, then we'll be in recess.

20        Thank you, everyone.

21            THE CLERK:  All rise.

22                 (Court recessed 11:37 a.m.)

23                 C E R T I F I C A T E

24        I certify that the foregoing is a correct transcript from

25        the record of proceedings in the above-entitled matter.



1    /s/ Marci E.C. Chatelain

2    Marci E.C. Chatelain, CCR, RPR, RMR, CRR
     Federal Court Reporter

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25